**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF VIRGINIA**

**(ALEXANDRIA DIVISION)**

CLEO MANUEL CABAN,

1:26-cv-2810-MSN-LRV

Plaintiff,

v.

JOSHUA R. LAPRISE, individually and in his official capacity;

BAILIFF McCUE (true name to be confirmed), individually and in his official capacity;

JOHN DOE COURTHOUSE OFFICERS 1–10 (ACPD and/or Arlington County Sheriff's Office personnel present at the January 16, 2025 detention, identities and agency affiliation to be confirmed through discovery), individually and in their official capacities;

ACPD DOE (the uniformed Arlington County Police Department officer who ordered Mr. Caban to stop during the January 16, 2025 courtroom seizure, as identified by role on the contemporaneous courtroom audio recording; true name to be confirmed through discovery), individually and in his official capacity;

FEMALE COURT OFFICER DOE (the courthouse officer who attempted to take physical custody of Mr. Caban's personal effects during the January 16, 2025 courtroom seizure, as identified by role on the contemporaneous courtroom audio recording; true name to be confirmed through discovery), individually and in her official capacity;

JOHN DOE OFFICER(S) 1-5 (December 23, 2024 incident), individually and in their official capacities;

DR. BETH GOUSE, in her individual capacity;

PSYCHIATRIC NURSE PRACTITIONER AKAME EKWE, in her individual capacity;

DR. EUGENE FORIS SIMOPOULOS, in his individual capacity;

ARLINGTON COUNTY, VIRGINIA;

ARLINGTON COUNTY SHERIFF, in his official capacity; and JOHN DOE DETENTION AND MEDICAL PERSONNEL 1-5, individually and in their official capacities,

Defendants.

**Civil Action No.** 1:26-cv-2810-MSN-LRV

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS**

***42 U.S.C. § 1983; Title II of the ADA, 42 U.S.C. § 12132; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794***

**JURY TRIAL DEMANDED**

This Complaint asserts claims arising from the December 23, 2024 arrest of Plaintiff by Arlington County Police Department personnel and from a second, independent course of conduct arising from the January 16, 2025 Arlington County courthouse detention of Plaintiff. It sues the Arlington County Sheriff in his official capacity only to the extent consistent with the Eleventh Amendment considerations discussed below.

## INTRODUCTION

1. This is a civil rights action arising from the racially motivated, violent, and constitutionally defective arrest of Cleo Manuel Caban — an honorably discharged United States Army combat veteran, a veteran rated 100% combined, Total and Permanent by the Department of Veterans Affairs, with service-connected post-traumatic stress disorder as a substantial contributing condition, and an active National Geospatial-Intelligence Agency

Counterintelligence Contractor — at the hands of Arlington County Police Department officers in the early morning hours of December 23, 2024, and from a second, independent course of unconstitutional conduct that unfolded in the Arlington County courthouse itself on January 16, 2025, when court and security personnel seized and detained Mr. Caban for the act of filing a constitutionally protected pro se motion.

2. Before deploying military-grade OC pepper spray against Mr. Caban — a man waiting quietly in an apartment lobby for a rideshare vehicle — Officer Joshua R. Laprise made a remark that inferred or expressed racial animus toward Mr. Caban; the precise language remains subject to confirmation through discovery of body-worn camera audio and Computer-Aided Dispatch records currently withheld by ACPD. That remark was not incidental to what followed. It was the announcement of it.

3. The constitutional violations that ensued — a tackle without provocation, a chemical weapon deployed against a combat-injured veteran whose service-connected PTSD transformed a chemical assault into an involuntary flashback to an IED detonation in Taji, Iraq — were not the product of split-second judgment in a dangerous encounter. They were the product of an officer who saw a Black man in a building at 4:41 in the morning and decided what he deserved before the law required anything of him.

4. When Mr. Caban's United States Government credentials identifying him as a federal intelligence contractor were discovered, Officer Laprise's demeanor changed markedly — evidence, preserved on body camera footage currently suppressed by the Arlington County Police Department, of a consciousness of wrongdoing that no amount of administrative justification can overcome.

5. Three weeks later, in the same prosecution, a second and independent constitutional violation occurred inside the Arlington County courthouse. After Mr. Caban filed a motion to remove his court-appointed counsel and proceed pro se — a motion of the same character the Commonwealth had already accepted from him, having addressed and served him as a pro se litigant in the companion cases arising from the same course of events — the presiding judge denied the motion, and when Mr. Caban rose to leave, ordered him stopped and then ruled, in a single continuous statement, that his bond was revoked and that she was ordering a mental health evaluation, without any evidentiary hearing, competency colloquy, or medical predicate of any kind. Bailiff McCue and John Doe courthouse officers then physically blocked Mr. Caban's exit with their weapons gripped and arrested him. No charge was articulated at the time of this second seizure; the arresting official himself stated, when asked, that he did not know the basis for the arrest. Mr. Caban was thereafter detained for approximately ninety-one days, including thirty-seven days of involuntary commitment at Western State Hospital, where he was administered an antipsychotic medication he had never previously been prescribed — notwithstanding that the hospital's own discharge summary ultimately found him competent to stand trial.

6. The trespass charge that was the sole stated basis for Mr. Caban's December 23, 2024 arrest was Nolle Prosequi'd by the Commonwealth of Virginia on April 17, 2025. The Commonwealth abandoned its own predicate.

7. Mr. Caban brings this action pursuant to 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act to redress violations of his rights under the First, Fourth, Sixth, and Fourteenth Amendments to the United States Constitution,

together with pendent Virginia state-law claims. He seeks compensatory and punitive damages, declaratory relief, and such other relief as this Court deems just and proper.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) (civil rights).

9. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as those claims arise from the same nucleus of operative fact as the federal claims.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to this claim occurred in Arlington County, Virginia, within the Eastern District of Virginia, Alexandria Division.

## THE PARTIES

### Plaintiff

11. Plaintiff CLEO MANUEL CABAN ("Mr. Caban") is a natural person and citizen of the United States, currently residing in Woodbridge, Prince William County, Virginia. At all times relevant to this Complaint, Mr. Caban was a citizen in good standing, a United States Army veteran with an Honorable Discharge, a veteran rated 100% combined, Total and Permanent by the Department of Veterans Affairs, with service-connected post-traumatic stress disorder as a substantial contributing condition, and an active federal contractor credentialed by the National Geospatial-Intelligence Agency as a Counterintelligence Officer.

**Defendants**

12. Defendant JOSHUA R. LAPRISE ("Officer Laprise") was at all relevant times a sworn law enforcement officer employed by the Arlington County Police Department, Arlington County, Virginia, bearing Badge Number 1824. Officer Laprise is sued in his individual capacity and in his official capacity.

13. Defendants JOHN DOE OFFICER(S) 1-5 are sworn law enforcement officers of the Arlington County Police Department whose identities are presently unknown to Plaintiff, who was denied access to body camera footage and incident reports through the Virginia Freedom of Information Act. Specifically, and upon information and belief, at least one additional uniformed Arlington County Police Department officer — pleaded here as JOHN DOE OFFICER 1 — was physically present alongside Officer Laprise throughout the December 23, 2024 encounter, including during the remark evidencing racial animus, the deployment of oleoresin capsicum spray, and the takedown described below. That officer's identity does not appear on either charging document: Officer Laprise is the sole complainant named on both Arlington County General District Court Case No. GC24007185-00 (Obstruct/Resist) and Case No. GC24007186-00 (Trespass After Forbidden), each arising from the same December 23, 2024 arrest. The identity of John Doe Officer 1 is therefore recorded, if at all, only in the computer-aided dispatch log, the responding-unit assignment records, the body-worn camera footage, and the incident reports — each of which is within the exclusive possession of Arlington County and each of which has been withheld from Plaintiff. Plaintiff will amend this Complaint to substitute the true names of these defendants promptly upon their identification, and has moved concurrently for leave to take expedited discovery directed to that purpose. These defendants are sued in their individual and official capacities.

14. Defendant BAILIFF McCUE (true spelling, full name, badge number, and employing agency to be confirmed through the Virginia Freedom of Information Act requests described in Paragraph 59) is, upon information and belief, a deputy of the Arlington County Sheriff's Office assigned to courtroom security duties at the Arlington County General District Court pursuant to Va. Code § 53.1-120, which vests Virginia sheriffs with sole responsibility for courthouse and courtroom security. Bailiff McCue is sued in his individual capacity for the reasons stated in Paragraph 21 below, and in his official capacity to the extent such capacity is not barred by the Eleventh Amendment.

15. Defendants JOHN DOE COURTHOUSE OFFICERS 1–10 are the deputies and/or police officers who, on January 16, 2025, physically blocked Mr. Caban's exit from the Arlington County courthouse with their weapons gripped and participated in his seizure and detention. Plaintiff's own contemporaneous account describes these individuals as "Arlington Police officers," but because Virginia law assigns courtroom security to the Arlington County Sheriff's Office rather than to the Arlington County Police Department, see Va. Code § 53.1-120, the precise agency affiliation of each John Doe Courthouse Officer is presently unknown and is pleaded in the alternative as ACPD and/or Arlington County Sheriff's Office personnel, to be resolved through the FOIA requests described in Paragraph 59 and discovery. They are sued in their individual and official capacities.

16. Defendant DR. BETH GOUSE is, upon information and belief, a forensic psychologist who, acting at the request of or on behalf of the Arlington County General District Court, recommended that Mr. Caban be evaluated for competency and be administered antipsychotic medication, based upon a single conversation rather than a structured forensic evaluation conforming to Va. Code § 19.2-169.1(A). She is sued in her individual capacity.

17. Defendant PSYCHIATRIC NURSE PRACTITIONER AKAME EKWE ("NP Akamei") was, upon information and belief, a nurse practitioner providing psychiatric services at the Arlington County Detention Facility who communicated to Mr. Caban, through Arlington County Department of Human Services staff, that he would be prescribed antipsychotic medication or be transferred to Western State Hospital. She is sued in her individual capacity as a state actor under West v. Atkins, 487 U.S. 42 (1988).

18. Defendant DR. EUGENE FORIS SIMOPOULOS was, upon information and belief, the attending physician at Western State Hospital responsible for prescribing and maintaining Mr. Caban on Olanzapine 10mg three times daily despite the absence of any psychotic disorder diagnosis and the absence of the judicial findings required by Sell v. United States, 539 U.S. 166 (2003). He is sued in his individual capacity.

19. Defendant ARLINGTON COUNTY, VIRGINIA ("Arlington County" or "the County") is a political subdivision of the Commonwealth of Virginia, organized and existing under the laws of Virginia. Arlington County operates the Arlington County Police Department ("ACPD") and the Arlington County Department of Human Services, and is responsible for the policies, practices, customs, training, supervision, and discipline of ACPD officers and DHS personnel, including the individual defendants. Arlington County is subject to suit under 42 U.S.C. § 1983 pursuant to Monell v. Department of Social Services, 436 U.S. 658 (1978). The Arlington County Police Department is not itself a separate legal entity subject to suit; Arlington County is the proper municipal defendant for the conduct of ACPD officers.

20. Defendant ARLINGTON COUNTY SHERIFF (the "Sheriff") is a constitutional officer of the Commonwealth of Virginia who operates the Arlington County Detention Facility, provides courthouse and courtroom security pursuant to Va. Code § 53.1-120, and is

responsible — since the Sheriff's Office assumed direct control of jail medical operations — for the medical and behavioral-health care of persons detained therein, including the policies, training, and supervision of detention deputies, courtroom security deputies, and medical personnel. The Sheriff is sued in his official capacity, subject to the Eleventh Amendment caveat set forth in Paragraph 21. The Office of the Sheriff is funded and indemnified through the Commonwealth's Division of Risk Management and statutory officer bonds. Va. Code §§ 15.2-1525, 15.2-1527.

21. Plaintiff is aware that Virginia local jails, and the sheriffs who administer them, have been held by at least one court in this District to function as arms of the Commonwealth of Virginia for Eleventh Amendment purposes in certain respects. McCoy v. Chesapeake Corr. Ctr., 788 F. Supp. 890 (E.D. Va. 1992). Plaintiff accordingly pleads the official-capacity claims against the Sheriff in the alternative and without prejudice to Plaintiff's primary theory of recovery against Bailiff McCue and the John Doe Courthouse Officers in their individual capacities, which is unaffected by the Eleventh Amendment regardless of the Sheriff's entity status. Hafer v. Melo, 502 U.S. 21 (1991). Plaintiff further preserves all Virginia state-law claims against the same individuals, which arise under this Court's supplemental jurisdiction and do not implicate the Eleventh Amendment as to individual-capacity defendants.

22. Defendants JOHN DOE DETENTION AND MEDICAL PERSONNEL 1-5 are deputies, nurses, and medical or mental-health staff of the Arlington County Sheriff's Office responsible for Mr. Caban's custody, medical care, and psychiatric processing during his detention, whose identities are presently unknown to Plaintiff. They are sued in their individual and official capacities and will be substituted by true name upon identification through discovery.

23. Scope of Employment and Indemnification. At all relevant times, each individual Defendant acted within the scope of his or her employment and under color of state law. By reason of that scope of employment, Arlington County and/or the Arlington County Sheriff are obligated to indemnify the individual Defendants for, and/or to provide liability coverage satisfying, any compensatory judgment entered against them, including through applicable self-insurance, the Virginia Division of Risk Management, and group self-insurance risk pools. This allegation establishes the source of satisfaction of any judgment and does not concede that punitive damages are subject to indemnification.

24. Mr. Caban's court-appointed defense counsel, Harry Dennis III, is not named as a defendant in this Complaint because a public defender or court-appointed attorney performing traditional defense functions does not act under color of state law for purposes of 42 U.S.C. § 1983. Polk County v. Dodson, 454 U.S. 312 (1981). Mr. Dennis's conduct is instead the subject of a renewed complaint to the Virginia State Bar and a separate state-law legal malpractice claim, addressed in companion filings.

## STATEMENT OF FACTS

### I. MR. CABAN'S BACKGROUND

25. Mr. Caban served in the United States Army from April 2005 to April 2008. His Military Occupational Specialty was 35L10 — Counterintelligence Agent. He was stationed at Fort Meade, Maryland, assigned to the 301st Military Intelligence Battalion, and deployed to Iraq from June 2006 to July 2007, where he was awarded the Combat Action Badge — a federal recognition that a soldier engaged in, or was personally present and under fire from, hostile forces. He received an Honorable Discharge.

**26.** As a result of his combat service, Mr. Caban has a service-connected disability rating from the Department of Veterans Affairs of one hundred percent (100%) combined, Total and Permanent (effective October 9, 2025), with post-traumatic stress disorder (PTSD) as a substantial contributing service-connected condition. His PTSD is documented, diagnosed, and severe. The trajectory of that combined rating tracks the events at issue in this Complaint: as reflected in the Department of Veterans Affairs' own rating history, Mr. Caban's combined disability rating stood at 70% effective October 8, 2024 — approximately six weeks before the events described herein — rose to 90% effective October 31, 2024, and the VA thereafter adjudicated him 100% permanently and totally disabled, effective October 9, 2025. The Department of Veterans Affairs itself has thus adjudicated the escalation of Mr. Caban's combined service-connected disability, inclusive of his psychiatric condition, across the period of the violations alleged herein. Chemical irritants, physical restraint, sudden loss of positional control, and the sounds and sensory environment of law enforcement confrontations constitute documented triggers for his combat-related flashbacks.

**27.** At the time of his arrest on December 23, 2024, Mr. Caban was an active federal contractor employed as a Counterintelligence Officer (Contractor) by the National Geospatial-Intelligence Agency ("NGA"), an agency of the United States Department of Defense. His NGA-issued credential (Badge SIC-0192) was active with an expiration date of May 17, 2026. The credential states on its face that its bearer "is an accredited representative of the United States Government engaged on official business for the National Geospatial-Intelligence Agency," is issued by the NGA Office of Counterintelligence, and recites that the bearer "is authorized to conduct counterintelligence related activities and other duties as entrusted," with unauthorized use punishable under 18 U.S.C. §§ 499, 506, 701, and 912 —

language available to the responding officers when they examined it, and language that gave Mr. Caban's later courtroom descriptions of his work a documented, verbatim factual basis.

**28.** Mr. Caban was previously employed as a Dark Web Threat Hunter at Verizon's VTRAC (Verizon Threat Research Advisory Center) division until his constructive discharge on September 19, 2024 — approximately three months before the events described herein. That separation, and the Verizon conduct giving rise to it, are the subject of a separate action, Caban v. Verizon Communications, Inc., No. 1:25-cv-01361-RDA-LRV (E.D. Va.), and are not alleged to have been caused by the events of December 23, 2024. The events described herein instead further and separately exacerbated Mr. Caban's pre-existing, service-connected PTSD.

## II. THE ARREST — DECEMBER 23, 2024

**29.** At approximately 4:41 AM on December 23, 2024, Mr. Caban was present in the lobby of Crystal Tower Apartments, located at 1600 South Eads Street, Arlington, Virginia, waiting for a rideshare vehicle he had summoned via a rideshare application.

**30.** The management of Crystal Tower Apartments contacted the Arlington County Police Department regarding Mr. Caban's presence in the lobby. No allegation has been made that Mr. Caban was violent, intoxicated, disruptive, or engaged in any threatening conduct. He was waiting.

**31.** Officers Joshua R. Laprise and one or more John Doe ACPD officers responded to the scene. Rather than issue a summons — the standard procedure for a misdemeanor trespass contact — Officer Laprise and the responding officers elected to take Mr. Caban into physical custody.

32. Before deploying any use of force, and before Mr. Caban engaged in any conduct that would objectively justify physical force, Officer Laprise made a remark, within Mr. Caban's hearing, that inferred or expressed racial animus toward him; the precise language remains subject to confirmation through discovery of body-worn camera audio and Computer-Aided Dispatch records currently withheld by ACPD under FOIA response P003262-051825 (409 pages withheld). That remark was followed immediately by the deployment of OC pepper spray. Mr. Caban heard the remark, and in written accounts predating this Complaint — including his May 5, 2025 correspondence to the Office of United States Senator Tim Kaine, copied to the United States Department of Justice Civil Rights Division — has consistently described it as a racial slur.

33. Officers then tackled Mr. Caban to the floor of the apartment lobby without lawful justification. At the time the force was initiated, Mr. Caban was not threatening any officer, had not engaged in any conduct that would objectively justify force, and posed no reasonably articulable threat to the safety of any person. Any conduct underlying the separate Obstruction charge (GC24007185-00) is alleged to have occurred, if at all, only after the force and custodial-arrest decision challenged in this Complaint, and nothing in this paragraph or this Complaint should be construed to imply the invalidity of that charge. Heck v. Humphrey, 512 U.S. 477 (1994).

34. The chemical and physical assault triggered a severe PTSD flashback. The combination of chemical irritant spray, physical restraint, and loss of positional control transported Mr. Caban's perception to Taji, Iraq, 2007, where an explosively formed penetrator (EFP) detonation had destroyed a convoy vehicle in his proximity. Mr. Caban experienced

immediate sensory dysregulation, involuntary terror responses, and psychological crisis as a direct and foreseeable consequence of the officers' actions.

35. Mr. Caban sustained physical injuries including an injury to his right ankle (subsequently documented at Western State Hospital) and permanent nerve damage caused by the tackle and restraint.

36. Following the tackle and OC spray deployment, and after placing Mr. Caban in custody and advising him of his Miranda rights, Officer Laprise and/or the John Doe officers discovered Mr. Caban's National Geospatial-Intelligence Agency Counterintelligence Officer (Contractor) credential (Badge SIC-0192, expiration May 17, 2026). Upon discovery of these federal credentials, the officers' demeanor changed markedly — a fact documented by Mr. Caban and preserved on body camera footage currently withheld by ACPD pursuant to a blanket FOIA exemption claim covering 409 records. Upon information and belief, the same or a related officer applied a Medline-brand disposable ECG/cardiac monitoring electrode to Mr. Caban's chest shortly after this discovery and while "cleaning up" his face — a medical intervention not ordinarily performed by patrol officers, and one that, on information and belief, contributed to delaying Mr. Caban's presentment to a magistrate for several hours in a manner potentially inconsistent with Gerstein v. Pugh, 420 U.S. 103 (1975), and County of Riverside v. McLaughlin, 500 U.S. 44 (1991).

37. Mr. Caban was arrested and charged with (1) Trespass After Forbidden, Va. Code § 18.2-119 (Case No. GC24007186-00); and (2) Obstruction/Resisting an Officer, Va. Code § 18.2-460 (Case No. GC24007185-00). The arrest was executed at approximately 4:45 a.m. on December 23, 2024 by Officer J. Laprise, Badge No. 1824, and Mr. Caban was held at the Arlington County Detention Facility. A bond hearing set for January 9, 2025 was continued.

He was released the following day: by Recognizance on Form DC-330, administrative number 013GM2500000456, Magistrate John David Kuntz ordered at 12:26 a.m. on January 10, 2025 that the defendant be "released on the conditions listed in this document," upon a $1,500 bond secured through a surety. Mr. Caban thereafter returned to the courthouse voluntarily on January 15, 2025 to file the motion described below, and again on the morning of January 16, 2025 for the hearing upon it.

## III. THE JANUARY 16, 2025 COURTHOUSE DETENTION

**38.** On January 15, 2025, Mr. Caban returned to the Arlington County General District Court and filed, with the clerk, a pro se motion to remove his court-appointed counsel, Harry Dennis III, and to proceed pro se — a motion of the same character that the Commonwealth had already accepted from him. On October 21, 2024, Assistant Commonwealth's Attorney Frank Webb addressed Mr. Caban in writing as "a pro se party," reminded him that he was "obliged to follow all of the rules of Virginia Criminal procedure," and then answered his pro se motion on the merits, point by point. On December 6, 2024, the Commonwealth certified service of its Motion to Dismiss in Arlington County Circuit Court Case No. CR24001037-00 upon "the Defendant, Cleo Caban, pro se," and separately upon "his counsel in another pending District Court Matter, Harry Dennis" — the Commonwealth thus distinguishing, in its own filing, between the matters in which Mr. Caban appeared for himself and the single matter in which Mr. Dennis appeared for him. The docket of that Circuit Court case records his attorney of record as "(Waived/Self-Represented)." Upon information and belief, the Arlington County General District Court had likewise permitted Mr. Caban to proceed pro se on a prior occasion in 2024; a certified copy of any such order is being requested from the Clerk of that court. The same day, Mr. Caban hand-delivered a copy of the motion to Assistant Commonwealth's

Attorney Frank Webb at the Commonwealth's Attorney's Office, and attempted to deliver a copy to Mr. Dennis in person at Mr. Dennis's office, where staff informed him that Mr. Dennis was not in the office that day (a Wednesday). The fact and date of that filing are independently corroborated by Mr. Caban's sworn, contemporaneous account in Arlington County Sheriff's Office Inmate Grievance Form #16614-G (February 8, 2025) — "ON WED. JAN. 15, 2025, I went to the 2nd Floor AND filed a Motion to represent myself (Pro Se') motion" — and by his May 18, 2025 VFOIA request to Arlington County, which expressly sought "[t]he Pro Se Motion filed by Cleo Caban" from the court's own file; a certified copy is being requested from the Clerk of the Arlington County General District Court. Mr. Dennis confirmed on the record the following morning that he had learned of the motion when "Mr. Webb notified me yesterday" — that is, the Commonwealth had actual notice of the motion, and was the channel through which defense counsel learned of it, a full day before the January 16, 2025 hearing.

**39.** On January 16, 2025, at approximately 10:00 a.m., Mr. Caban presented this motion to the presiding judge, the Honorable R. Frances O'Brien (since retired), in open court, with Mr. Dennis standing beside him. Judge O'Brien denied the motion, stating that Mr. Dennis was sufficient counsel for the case.

**40.** During the colloquy preceding the court's ruling, Judge O'Brien asked Mr. Caban why he believed he could better represent himself than have "one of the most experienced attorneys in our court" represent him. In response, Mr. Caban described his prior service as an Army counterintelligence agent and his work as an NGA contractor, and connected that background to the December 23, 2024 arrest. Judge O'Brien twice cautioned Mr. Caban regarding courtroom decorum ("You're in a court of law," and "you better control yourself, or you're

gonna be sitting in the back") but did not terminate the exchange, asked follow-up questions, and engaged with Mr. Caban's substantive point that Mr. Dennis had not communicated with him since the December 23, 2024 arrest. At no point during this multi-minute, on-the-record exchange did Judge O'Brien, the Commonwealth's Attorney, or Mr. Dennis request a competency evaluation, summon a mental health professional, or otherwise place on the record any articulated basis for questioning Mr. Caban's capacity to understand the proceedings, as required by Va. Code § 19.2-169.1(A) before the question of competency may even be raised. The recording further captures that, mid-colloquy — before ruling on the motion and before Mr. Caban made any movement to leave — Judge O'Brien interrupted the exchange to ask, "Okay. Can I talk to Deputy McCue?", and conferred with Deputy McCue in an exchange not audible on the recording. The court thus summoned and conferred with the very officer who would, minutes later, execute the seizure — before any of the conduct later said to justify that seizure had occurred.

41. After Judge O'Brien denied the motion and stated, "I'm not gonna bring any motion. I want you to have a seat. All right, have a seat," Mr. Caban responded, "I'm all set, Your Honor. I'll see you in court," and turned to leave the courtroom — his business with the court that day concluded. This account, and each quotation in this paragraph and the paragraphs that follow describing the January 16, 2025 hearing, is drawn from the verbatim, contemporaneously recorded audio of the hearing now in Plaintiff's possession, which controls over any paraphrase in Plaintiff's earlier correspondence to the extent of any variance. Judge O'Brien then stated, "Please stop, Mr. Caban," and courthouse officers can be heard on the recording repeating, "Officers, stop that man." Judge O'Brien then ruled, in a single continuous statement: "Mr. Caban, your bond is revoked. I'm gonna order a Mental

Health Evaluation." No medical professional, competency colloquy, or evidentiary predicate of any kind preceded this ruling.

42. Mr. Caban was simultaneously blocked from the courtroom exit by John Doe Courthouse Officers, described by Mr. Caban contemporaneously as "Arlington Police officers, with their weapons now being gripped." Approximately five to ten such officers participated in physically stopping and detaining him. On the recording, ACPD Doe can be heard stating, "Mr. Caban, I'm gonna need you to stop," and officers can be heard repeating, "Stop. Stop. Stop. Stop. Stop. Okay. Let it go. Just —" while restraining him.

43. During the same sequence, Female Court Officer Doe approached Mr. Caban and stated, "Let me hold your stuff," then, "Put your stuff down." Mr. Caban responded, "Please don't touch me." Mr. Caban then stated, audibly and to the courtroom at large, "Are you guys arresting me? Is everybody witnessing this? I'm being arrested because I have a voice" — a statement met with audible disbelief from Mr. Caban, as captured on the recording.

44. Immediately after Mr. Caban was seized and removed, the recording captures Judge O'Brien stating, "apologies to, uh, the court, um, things like this happen," and resuming the routine traffic docket ("Let's get these 930s off the deck") — without summoning any medical or mental-health personnel, making any further record concerning Mr. Caban's condition, or taking any other step consistent with a genuine, contemporaneously held belief that a psychiatric emergency requiring involuntary evaluation had just unfolded in the courtroom.

45. When Mr. Caban asked the basis for his arrest, the arresting official responded: "I don't know, Judge said to arrest you." No charge, warrant, or articulable offense was identified at the time of this seizure. Mr. Caban had committed no crime; filing a pro se motion is constitutionally protected conduct under the Sixth Amendment. Faretta v. California, 422 U.S. 806 (1975).

46. No evidentiary hearing, representation of counsel, or representation of the Commonwealth's Attorney supporting probable cause to believe Mr. Caban lacked capacity to understand the proceedings or assist in his own defense — the threshold required by Va. Code § 19.2-169.1(A) before a court may even raise the question of competency — preceded Judge O'Brien's declaration. A defendant who had, that morning, drafted and orally presented a coherent legal motion demonstrated, by that very act, the capacity the court declared absent.

47. Mr. Caban was thereafter held at the Arlington County Detention Facility and, on February 18, 2025, transferred to Western State Hospital for a competency evaluation under Va. Code § 19.2-169.1, without the outpatient evaluation that the statute requires as the default before hospital-based evaluation. Va. Code § 19.2-169.1(B).

48. Defendant Dr. Beth Gouse recommended, based upon what Arlington County Department of Human Services staff described to Mr. Caban as a single conversation, that Mr. Caban be evaluated and treated with antipsychotic medication. Defendant NP Akame Ekwe and Arlington County DHS personnel, including staff identified to Mr. Caban as Ms. Lauryn and Ms. Kelsey, together with a third Department of Human Services employee whose name is presently unknown to Mr. Caban and who is identified herein as DHS DOE 1, communicated to Mr. Caban that he would be prescribed antipsychotic medication or be sent to Western State Hospital — an ultimatum, not a judicial determination satisfying *Sell* v. United States, 539 U.S. 166 (2003).

49. At Western State Hospital, Defendant Dr. Eugene Foris Simopoulos prescribed and maintained Mr. Caban on Olanzapine 10mg three times daily — a medication he had never previously been prescribed and one indicated for schizophrenia and bipolar disorder — notwithstanding that Mr. Caban's documented diagnoses were ADHD, PTSD, hypertension,

asthma, and a right ankle injury, with no diagnosis of any psychotic disorder. Western State Hospital's own laboratory findings during that admission, and its failure to monitor them, are set forth at Paragraphs 114A through 114C below.

**50.** On March 27, 2025, Mr. Caban was restored to competency and discharged from Western State Hospital. The discharge summary, signed by Dr. Simopoulos and admitting clinician Susannah Hamnet Dixon, PMHNP, states that Mr. Caban "completed evaluation and [was] found to be competent to stand trial." An April 14, 2025 letter to the presiding judge of the Arlington County General District Court from Andre Buffington, a Behavioral Health Therapist in the Division of Behavioral Health Care of the Arlington County Department of Human Services, written in advance of the April 15, 2025 hearing, states that discharge planning is "a voluntary service offered to all clients discharged from WSH," that each plan's treatment and housing recommendations "are entirely voluntary," and that discharge plans "are not designed to argue bonds or ensure compliance with bond conditions." The same letter describes Mr. Caban as an individual "returning to Arlington County Detention Facility (ADCF) from Western State Hospital," independently confirming that his confinement continued at the detention facility after his March 27, 2025 discharge. In total, Mr. Caban was confined for approximately ninety-one days as a direct result of the January 16, 2025 courtroom seizure — thirty-three days at the Arlington County Detention Facility, thirty-seven days at Western State Hospital, and a further twenty-one days returned to the Arlington County Detention Facility until his release on April 17, 2025 — for conduct that consisted entirely of filing a motion and attempting to leave a courthouse.

**51.** On February 8, 2025, Mr. Caban filed Arlington County Sheriff's Office Inmate Grievance Form #16614-G, describing the January 16, 2025 courtroom seizure in terms materially

consistent with the account set forth above. The Sheriff's Office responded in writing on February 10, 2025, that "this grievance is not for the ACDF. Please reach out to your attorney or write the courts about your concern," declining to address the substance of the grievance on jurisdictional grounds. To the extent 42 U.S.C. § 1997e(a) is asserted to apply to any claim pleaded herein, that written refusal rendered the grievance process unavailable to Mr. Caban as to the courthouse-seizure claim: an administrative remedy that officials themselves decline to administer is not "available" within the meaning of the statute, and exhaustion is therefore satisfied or excused. Ross v. Blake, 578 U.S. 632, 642–44 (2016).

52. On April 17, 2025, before the Honorable Jason S. Rucker, the Commonwealth of Virginia entered a *Nolle Prosequi* dismissal of the Trespass charge (GC24007186-00) — the sole predicate charge for Mr. Caban's December 23, 2024 arrest. Mr. Caban entered a guilty plea to Obstruction under GC24007185-00. The circumstances of that plea — preceded by more than one hundred days of detention across two periods of custody, the January 16, 2025 courthouse seizure, thirty-seven days of involuntary commitment at Western State Hospital, and the forced administration of antipsychotic medication — are the subject of a separate coram vobis proceeding addressed in a companion filing.

53. Mr. Caban completed his probationary term on April 22, 2026, per written confirmation from Probation Officer Thomas M. Beattie, Prince William County Criminal Justice Services (letter dated April 28, 2026). He has complied with every condition of supervision imposed by the Commonwealth.

54. Plaintiff's exercise of his right to petition the courts and press regarding suspected judicial misconduct did not begin on January 16, 2025. On June 18, 2024 — nearly seven months before the January 16, 2025 courtroom seizure — Mr. Caban formally notified the Clerk's

Office of the Arlington County General District Court, by email to the court's official address (arlingtongd@vacourts.gov), of his intent to seek comprehensive records and to contact media regarding suspected bias by five sitting Arlington judges, including Judge O'Brien by name, and of his intent to notify the Judicial Inquiry and Review Commission, Arlington County Internal Affairs, and the local bar association of any findings. Judge O'Brien and the Clerk's Office were therefore on notice, months before the January 16, 2025 hearing, that Mr. Caban was investigating the judiciary and had threatened to expose alleged misconduct to the media — a fact bearing directly on the retaliatory character of the seizure described in Count VIII, below.

55. Nor was January 16, 2025 the first time an Arlington County official reached for a mental-health characterization of Mr. Caban in response to his legal advocacy. On October 21, 2024 — nearly three months before the January 16, 2025 hearing — Assistant Commonwealth's Attorney Frank Webb closed a written email response to Mr. Caban's pro se discovery inquiries in a separate Arlington County matter with the question: "Any word regarding getting yourself to see a license[d] clinical social worker, Mr. Caban?" — an unprompted suggestion, from the prosecutor's office, that a citizen pressing Fourth Amendment questions should seek mental-health care. This documented, months-earlier pattern of official mental-health framing bears on whether the January 16, 2025 competency declaration reflected a genuine, contemporaneously formed concern or a pre-existing institutional narrative deployed against a persistent pro se litigant.

## IV. FOIA WITHHOLDING — SUPPRESSION OF ACCOUNTABILITY EVIDENCE

**56.** Mr. Caban submitted a Virginia Freedom of Information Act request (Request No. P003262-051825) seeking all body camera footage, incident reports, OC spray deployment logs, use of force documentation, and internal communications related to the December 23, 2024 incident.

**57.** ACPD withheld all 409 responsive records in their entirety, citing Va. Code § 2.2-3706.1(D) (criminal investigative file exemption) and Va. Code § 2.2-3706(B)(9) (administrative investigation exemption). The blanket withholding of 409 records without individualized review of each record for releasable portions is facially inconsistent with the particularized-review and partial-release requirements of VFOIA, which forbid withholding an entire record where only a portion is exempt and require redaction and release of the remainder. Va. Code § 2.2-3704.01. ACPD repeated that conduct fifteen months later. On August 11, 2026 Mr. Caban submitted a second request, Reference No. *C008645-081226*, seeking internal-affairs and complaint records concerning Officer Laprise, any Use-of-Force report arising from the December 23, 2024 incident, the agency-level Community Policing Act data ACPD reported under Va. Code § 52-30.2, and Community Oversight Board records. ACPD took the full five working days, invoked Va. Code § 2.2-3704(B)(4) on the fifth day for seven more, and then on August 27, 2026 withheld everything responsive to the first two categories, stating that "the total volume of records withheld are 13" and citing Va. Code § 2.2-3706(B)(9) and § 2.2-3705.1(1). It again produced no record, no redacted record, and no description of any withheld record. It declined to search for Community Oversight Board records at all, and supplied none of the contact information Va. Code § 2.2-3704(B)(3) requires when a public body knows another body holds the records sought.

58. Upon information and belief, the withheld records include body camera footage depicting Officer Laprise's verbalization of the remark evidencing racial animus immediately before OC spray deployment, the tackle, the force application, and the officers' demeanor change upon discovering Mr. Caban's federal credentials.

59. Mr. Caban has separately requested, and Defendants Arlington County and the Arlington County Sheriff are on notice that he will separately request, courtroom security post orders, deputy assignment rosters, incident and use-of-forcereports, and the identity, badge number, and personnel record index entry for Bailiff McCue, together with any CAD or dispatch records reflecting ACPD presence at or near the Arlington County courthouse, for January 16, 2025.

## CLAIMS FOR RELIEF

## COUNT I

### Fourth Amendment — Excessive Force

### *42 U.S.C. § 1983*

### Against Defendant Laprise and John Doe Officers

60. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

61. At all relevant times, Defendants Laprise and John Doe Officers were acting under color of state law as sworn ACPD officers.

62. The Fourth Amendment to the United States Constitution prohibits unreasonable seizures, including the unreasonable use of force during an arrest. Graham v. Connor, 490 U.S. 386 (1989).

63. The force applied against Mr. Caban — OC spray deployment and physical tackle — was objectively unreasonable under the totality of the circumstances. Mr. Caban was contacted for a misdemeanor trespass (subsequently abandoned by the Commonwealth); he posed no immediate threat to officer safety; he was not fleeing; and he was not actively resisting at the time force was initiated.

64. The remark made by Officer Laprise immediately before OC spray deployment — evidencing racial animus, its precise wording subject to confirmation through discovery of currently withheld body-worn camera audio — is probative evidence that the force was motivated by racial animus rather than any objective law enforcement purpose. The application of force motivated by racial bias, against a person who posed no articulable threat, violates the Fourth Amendment as construed in *Graham v. Connor* and *United States v. Lanier*, 520 U.S. 259 (1997).

65. As a direct and proximate result of Defendants' use of excessive force, Mr. Caban sustained: (a) a right-ankle injury; (b) permanent nerve damage; (c) severe exacerbation of his service-connected PTSD, including a full dissociative flashback episode to combat in Taji, Iraq; (d) pain and suffering; and (e) humiliation, emotional distress, and psychological harm. These injuries support compensatory damages, under this Count, of not less than $750,000 for physical injury and permanent disability, not less than $2,000,000 for the exacerbation of his service-connected PTSD, and not less than $2,500,000 for the present value of future life-care and mental-health treatment — a total of not less than $5,250,000. Defendants take their

victim as they find him; under the settled eggshell-plaintiff rule they are liable for the full extent of the psychiatric harm their conduct inflicted. The loss-of-liberty damages flowing from the arrest are set forth in Count II, and the professional and national-security career harm in Count VIII; the Virginia common-law measure of the same physical and psychiatric injuries is pleaded in the alternative in Count XII.

**66.** The conduct of Defendant Laprise was willful, malicious, and in reckless disregard of Mr. Caban's clearly established constitutional rights, such that an award of punitive damages is warranted under *Smith v. Wade, 461 U.S. 30 (1983)*.

**COUNT II**

**Fourth Amendment — Unlawful Arrest / False Arrest**

**42 U.S.C. § 1983**

**Against Defendant Laprise and John Doe Officers**

**67.** Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

**68.** The Fourth Amendment protects against arrest without probable cause. A warrantless arrest is presumptively unreasonable. *Payton v. New York, 445 U.S. 573 (1980)*.

**69.** The sole predicate for Mr. Caban's arrest was a trespass complaint from apartment management. Upon information and belief, no prior written or formal notice excluding Mr. Caban from Crystal Tower Apartments was ever served on or communicated to Mr. Caban, which is a prerequisite for the 'trespass after forbidden' offense under Va. Code § 18.2-119.

**70.** The Commonwealth's subsequent Nolle Prosequi dismissal of the Trespass charge on April 17, 2025, is powerful evidence that probable cause was absent at the time of arrest.

71. This Count challenges only the lawfulness of Mr. Caban's warrantless custodial arrest on the Trespass charge (GC24007186-00), which the Commonwealth abandoned by Nolle Prosequi on April 17, 2025. It does not challenge, and a judgment in Plaintiff's favor on this Count would not necessarily imply the invalidity of, the separate Obstruction charge (GC24007185-00) arising from the same encounter; that charge rests on conduct alleged to have occurred after the custodial-arrest decision challenged here and is supported, if at all, by an independent factual predicate. Plaintiff therefore seeks through this Count no relief that would necessarily imply the invalidity of any outstanding conviction. *Heck v. Humphrey*, 512 U.S. 477 (1994).

72. The decision to effect a full custodial arrest of Mr. Caban — rather than to issue a citation or summons for an alleged Class 1 misdemeanor — was made by Defendant Laprise, the senior sworn ACPD officer on scene, together with the responding John Doe Officer(s), and was objectively unreasonable and constituted a seizure of Mr. Caban's person without adequate legal justification.

73. As a direct and proximate result of his unlawful arrest, Mr. Caban was deprived of his physical liberty for more than one hundred nine (109) days and subjected to the subsequent constitutional violations detailed herein. Valued at $7,500 per day, this loss of liberty supports compensatory damages, under this Count, of not less than $817,500. The loss of liberty is itself a compensable constitutional injury independent of pecuniary loss. *Memphis Community School District v. Stachura*, 477 U.S. 299, 307 (1986); *Carey v. Piphus*, 435 U.S. 247 (1978). To the extent the confinement following the January 16, 2025 courthouse seizure is independently actionable under Counts VIII and X, the loss-of-liberty damages attributable to that period are pleaded in the alternative and are not sought in duplication of the damages recovered under this Count.

## COUNT III

### Fourteenth Amendment — Equal Protection

### Racially Motivated Arrest and Use of Force — 42 U.S.C. § 1983

### Against Defendant Laprise and John Doe Officers

**74.** Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

**75.** The Equal Protection Clause of the Fourteenth Amendment prohibits state actors from treating similarly situated persons differently on the basis of race. Village of Arlington *Heights* v. Metropolitan Housing Dev. Corp., *429 U.S. 252 (1977)*.

**76.** Officer Laprise's verbalization of a remark evidencing racial animus directed at Mr. Caban — a Black man — immediately before deploying OC spray is probative evidence of intentional racial discrimination. A contemporaneous racially animated remark by the officer applying force, once its precise wording is confirmed through the currently withheld body-worn camera audio, is among the forms of evidence courts have recognized as supporting an equal-protection claim. See *Burgess v. Lowery*, 201 F.3d 942 (7th Cir. 2000); *Feathers v. Aey, 319 F.3d 843 (6th Cir. 2003)*.

**77.** The arrest of Mr. Caban at 4:41 a.m. for a misdemeanor trespass contact — via full custodial arrest rather than summons, followed by OC spray and a tackle — reflects discriminatory enforcement. Plaintiff alleges, as an inference to be tested through discovery of ACPD dispatch, arrest, and use-of-force records, that similarly situated non-Black individuals encountered in the lobby of a residential building at that hour were not subjected to comparable force, and Plaintiff will seek those comparators in discovery.

78. The differential and racially motivated treatment violated Mr. Caban's right to the equal protection of the laws.

79. As a direct and proximate result of the racially discriminatory arrest and use of force, Mr. Caban sustained a distinct dignitary and emotional injury — the racial humiliation of being subjected to a chemical weapon immediately after a remark evidencing racial animus — compensable under *Stachura* and *Carey*, supporting compensatory damages, under this Count, of not less than $1,000,000. The same dignitary injury is pleaded in the alternative under Count XIII (Va. Code § 8.01-42.1) and is not sought in duplication.

**COUNT IV**

**Municipal Liability — Monell**

***42 U.S.C. § 1983***

**Against Defendant Arlington County, Virginia**

80. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

81. Under Monell v. Department of Social Services, 436 U.S. 658 (1978), a municipality is liable under § 1983 where a constitutional deprivation results from an official policy, a widespread custom, or deliberate indifference to a known pattern of constitutional violations. A municipality held liable under Monell is not entitled to qualified immunity and may not assert a good-faith defense. Owen v. City of Independence, 445 U.S. 622 (1980).

82. Theory A — Failure to Train: Officer Laprise was hired by ACPD on January 3, 2023, approximately twenty-three months before the December 23, 2024 incident. He is no longer employed by ACPD, having departed approximately thirteen months after the incident.

ACPD's failure to adequately train Officer Laprise in the constitutional constraints on the use of force against non-threatening misdemeanor contacts — and in the protocols applicable to encounters with federal contractors — constitutes deliberate indifference where the need for such training is obvious. City of Canton v. Harris, 489 U.S. 378 (1989). The need to train officers to recognize and accommodate persons with disabilities — including combat veterans with documented service-connected PTSD — in low-level, non-violent encounters is so obvious, and the consequence of the failure so predictable, that the failure to provide such training constitutes deliberate indifference under the single-incident theory recognized in Canton, 489 U.S. at 390 n.10.

**83.** Theory B — Custom of Suppression: ACPD's blanket withholding of 409 accountability records, without individualized review, reflects a systematic policy or custom of suppressing evidence of officer misconduct. A municipality that prevents post-incident accountability through FOIA stonewalling maintains a de facto custom that enables constitutional violations to recur without correction. That custom is documented in this very case: on May 20, 2025, ACPD withheld all 409 responsive records in their entirety while providing only the minimal criminal-incident summary that Va. Code § 2.2-3706(A)(2) makes mandatory; and on May 21, 2025, after Mr. Caban challenged the withholding, ACPD reaffirmed it in writing, asserted that Mr. Caban — the arrestee and subject of the very records at issue — did "not qualify" for disclosure, and advised him that "the County does not have a formal appeal process in place." A public body that elects blanket suppression at every discretionary decision point, and maintains no administrative mechanism by which that suppression can be reviewed, has made suppression its policy. The custom did not end with that request. On August 27, 2026 — fifteen months later, and after taking every day the statute allows —

ACPD withheld a further thirteen records concerning the same officer in their entirety, again without identifying the subject matter of any record withheld and again without releasing any segregable portion. Two blanket denials separated by fifteen months, directed at the same incident and the same officer, are not an aberration in processing. They are the practice.

**84.** Theory C — Pattern of Predicate-Charge Abandonment and Post-Hoc Justification: The Nolle Prosequi dismissal of the sole predicate Trespass charge is consistent with the broader pattern of seizure-first, justify-later enforcement documented in Theory E below, in which ACPD personnel effected seizures unsupported by their own contemporaneous evidence and then abandoned, or could not articulate, the predicate. Plaintiff does not rest this theory on the December 23, 2024 incident alone; it is pleaded together with, and as one instance of, the multi-incident pattern set forth in Theory E.

**85.** Theory D — Ratification: Arlington County's blanket suppression of all 409 records concerning the incident, together with its failure to discipline or retrain the officers involved, ratified and adopted the unconstitutional conduct as the policy of the municipality. City of St. Louis v. Praprotnik, 485 U.S. 112 (1988). That ratification was express, not tacit: when Mr. Caban challenged the blanket withholding, the County reaffirmed it in writing on May 21, 2025 and disclaimed the existence of any appeal process by which the decision could be reviewed. It ratified the same approach again on August 27, 2026, withholding thirteen further records concerning Officer Laprise in their entirety on the same discretionary administrative-investigation exemption, adding a personnel-records exemption, and refusing to search for the records of the very oversight body the County created to review police conduct.

**86.** Theory E — Pattern Across Multiple Officers and Incidents: The misconduct alleged here is not isolated. On March 9, 2024, a different ACPD officer (Badge #1858), assisted by additional officers, subjected Mr. Caban to a stop and a warrantless search predicated on automated license-plate-reader data, filed a charge unsupported by the officer's own contemporaneous breath-test reading, and then documented only child safety seats in an inventory report that omitted the items purportedly justifying the search; the citation issued at that same stop — Arlington County General District Court Case No. GT24004055-00, charging driving on a suspended or revoked license with a blood alcohol content of .02% or more, Va. Code § 18.2-272(B) — was adjudicated in Mr. Caban's absence on May 8, 2024 and entered as a conviction "Guilty In Absentia," with a fine and costs of $0.00, notwithstanding that the citing officer's own preliminary breath test returned 0.00% and that the officer stated on his body-worn camera that Mr. Caban was "not DUI." Mr. Caban's appeal of that conviction for trial de novo was dismissed for want of jurisdiction as untimely, so the .02% element has never been adjudicated on the merits in any court. On January 16, 2025, courthouse personnel seized and detained Mr. Caban for filing a protected pro se motion. Across three separate incidents within eleven months, involving multiple ACPD and/or Sheriff's Office personnel, Mr. Caban was subjected to materially similar patterns of seizure unsupported by the officers' own contemporaneous evidence or by any articulable offense, supporting the inference that the County maintains a custom, or has failed to train its personnel, such that these violations were a foreseeable result of municipal policy rather than aberrant individual conduct. The March 9, 2024 and January 16, 2025 incidents are pleaded here as evidence of the municipal pattern; the March 9, 2024 incident is the subject of separate

proceedings, and Plaintiff may move to consolidate related actions for pretrial purposes under Fed. R. Civ. P. 42(a).

87. The Monell violations described herein were a moving force behind the constitutional deprivations suffered by Mr. Caban.

88. Arlington County is liable, as the moving force behind the constitutional deprivations, for the compensatory damages set forth in Counts I, II, III, and VII, to the extent those deprivations were caused by the policies, customs, and practices alleged in this Count. This Count does not seek a separate or additional compensatory sum beyond the damages recoverable under those Counts; it establishes the County's municipal liability for them under *Monell*. Punitive damages are not sought against the County. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981).

**COUNT V**

**Virginia State Law — Malicious Prosecution**

**Pendent State Claim (28 U.S.C. § 1367)**

**Against Defendant Laprise**

89. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

90. Under Virginia law, malicious prosecution requires: (1) a prosecution commenced by the defendant; (2) without probable cause; (3) with malice; (4) a termination of the prosecution in the plaintiff's favor; and (5) damages. Wiggs v. Farmer, 208 Va. 516 (1968).

**91.** Defendant Laprise — the officer who swore out and initiated the Trespass charge against Mr. Caban — commenced that prosecution. As set forth above, probable cause was absent or legally insufficient given the absence of the formal prior notice required by Va. Code § 18.2-119. The remark evidencing racial animus verbalized before force is probative of malice. The Nolle Prosequi entered on April 17, 2025 constitutes a favorable termination. The compensatory damages flowing from the wrongful prosecution — loss of liberty and dignitary harm — are those set forth in Counts II and III and are pleaded here in the alternative, not in duplication; this Count independently entitles Mr. Caban to those damages against Defendant Laprise under Virginia law.

**92.** Defendant Laprise is liable for malicious prosecution under Virginia law.

**COUNT VI**

**Fourth Amendment — Failure to Intervene**

***42 U.S.C. § 1983***

**Against John Doe Officer(s) 1–5 and John Doe Courthouse Officers 1–10**

**93.** Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

**94.** An officer present at the scene who fails to take reasonable steps to protect a victim from another officer's use of excessive force is liable under the Fourth Amendment where he observed or had reason to know that excessive force was being used and possessed a realistic opportunity to intervene. *Randall v. Prince George's County*, 302 F.3d 188 (4th Cir. 2002).

**95.** This Count is not pleaded against an undifferentiated group of officers on the theory that one of them must be responsible. It is directed to the conduct of specific individuals, identified by what each is alleged to have done and by where each is alleged to have stood. As to the December 23, 2024 incident: John Doe Officer 1, described in Paragraph 13, was physically present alongside Officer Laprise for the remark evidencing racial animus, for the deployment of oleoresin capsicum spray against a compliant and non-fleeing man, and for the takedown that followed; he was close enough to observe each act as it occurred, the sequence unfolded over a period sufficient to permit intervention, and he neither intervened nor summoned a supervisor. As to the January 16, 2025 courthouse seizure: those John Doe Courthouse Officers who positioned themselves between Mr. Caban and the courtroom exit with their weapons gripped observed an arrest being effected for which no charge was stated then or afterward — a defect apparent on the face of the encounter, and confirmed by the arresting official's own contemporaneous statement, pleaded above, that he did not know the basis for the arrest — and each failed to question or halt it. Plaintiff does not presently know these officers' names because Arlington County has withheld the 409 responsive records identified in Paragraph 141, because no second officer is named on either December 23, 2024 charging document, and because Va. Code § 53.1-120(C) vests the Sheriff alone with responsibility for the identity of deputies designated for courtroom security. Plaintiff has moved concurrently for leave to take expedited discovery directed solely to identifying these individuals, and will seek leave to substitute their true names promptly upon identification.

**96.** As a direct and proximate result, Mr. Caban suffered the injuries described in Counts I and VIII. Each non-intervening Defendant is jointly liable for those injuries to the extent of his failure to intervene; no separate or additional compensatory sum is sought under this Count.

The failure to intervene was willful and in reckless disregard of clearly established rights, warranting punitive damages. *Smith v. Wade*, 461 U.S. 30 (1983).

## COUNT VII

### *Disability Discrimination — Failure to Accommodate*

### Title II of the ADA (42 U.S.C. § 12132) and Section 504 of the Rehabilitation Act (29 U.S.C. § 794)

### *Against Arlington County and the Arlington County Sheriff*

**97.** Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

**98.** Mr. Caban is a qualified individual with a disability. His service-connected PTSD, a substantial contributing condition to his 100% combined, Total and Permanent disability rating adjudicated by the Department of Veterans Affairs, substantially limits major life activities, including neurological function and the regulation of his response to perceived threat.

**99.** Title II provides that no qualified individual with a disability shall, by reason of disability, be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination. 42 U.S.C. § 12132. Title II applies to arrests, courthouse proceedings, and jail operations. *Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206 (1998). Section 504 imposes parallel duties on recipients of federal financial assistance, whose acceptance of federal funds waives sovereign immunity to such claims. As applied to conduct implicating the fundamental right of access to the courts — precisely the setting of the January 16, 2025 courthouse seizure — Title II validly abrogates state sovereign immunity. Tennessee v. Lane,

541 U.S. 509 (2004). In the Fourth Circuit, Title II reaches law-enforcement arrests and investigations, *Seremeth v. Board of County Commissioners of Frederick County*, 673 F.3d 333 (4th Cir. 2012), and a public entity's acceptance of federal financial assistance effects a waiver of Eleventh Amendment immunity as to Section 504 claims. Constantine v. Rectors & Visitors of George Mason University, *411 F.3d 474 (4th Cir. 2005)*.

**100.** Arlington County is a public entity that operates ACPD and the Department of Human Services; the Arlington County Sheriff is a public entity that operates the Arlington County Detention Facility and provides courthouse security. Both are recipients of federal financial assistance. *Their personnel knew*, or were presented *with* obvious indicia, *that* Mr. Caban was a disabled combat veteran — including his federal credentials — yet failed to make reasonable modifications to their respective practices to accommodate his known disability.

**101.** The failures to accommodate are attributable to each entity as follows. As to Arlington County: *ACPD's* deployment *of OC* spray and a violent *tackle* on *December 23, 2024* against a person whose service-connected PTSD was known or obvious, without any modification of its use-of-force practices. As to the Arlington County Sheriff: the January 16, 2025 courthouse removal and seizure executed by Sheriff's courtroom-security deputies without any modification to accommodate Mr. Caban's *disability*, and the subsequent detention and psychiatric processing at the Arlington County Detention Facility without reasonable accommodation. Each constituted discrimination by reason of disability by the entity *responsible* for it.

**102.** Arlington County and the Arlington County Sheriff each acted with deliberate indifference to Mr. Caban's federally protected rights, entitling him to compensatory damages, attorneys' fees, and costs under Title II and Section 504. The compensatory damages under this Count are the physical, liberty, and dignitary injuries set forth in Counts I, II, and VIII, allocated between the two entities as described above and pleaded in the alternative, not in duplication; this Count independently entitles Mr. Caban to those damages and to attorneys' fees against the public entities, which are not subject to qualified immunity.

## COUNT VIII

**Fourth, First, and Sixth Amendments — Unlawful Seizure and Retaliatory Arrest for Protected Pro Se Filing**

***January 16, 2025 Courthouse Detention — 42 U.S.C. § 1983***

**Against Bailiff McCue, ACPD Doe, Female Court Officer Doe, and John Doe Courthouse Officers 1–10**

**103.** Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

**104.** The Fourth Amendment prohibits the seizure of a person absent reasonable suspicion or, for a custodial arrest, probable cause. Terry v. Ohio, 392 U.S. 1 (1968). Filing a pro se motion is not a crime under any provision of Virginia law, and attempting to leave a courthouse upon the conclusion of a hearing is not a crime. There was no probable cause, and no charge was identified at the time of the seizure, as the arresting official's own contemporaneous statement — "I don't know, Judge said to arrest you" — confirms.

**105.** The Sixth and Fourteenth Amendments guarantee a criminal defendant the right to proceed pro se. Faretta v. California, 422 U.S. 806 (1975). That right has been clearly established for fifty years. No reasonable officer or deputy in January 2025 could have believed that arresting a defendant moments after he filed a constitutionally protected motion, with no intervening offense, was lawful.

**106.** To the extent Defendants assert that the arrest was supported by probable cause notwithstanding the absence of any articulated charge, Plaintiff pleads in the alternative that the arrest was retaliatory for the exercise of his First Amendment right to petition the court, and that he can present objective evidence that similarly situated litigants who did not engage in protected pro se filings were not seized and arrested upon leaving the Arlington County courthouse, satisfying the exception recognized in Nieves v. Bartlett, 587 U.S. 391 (2019). That retaliatory motive is further supported by the fact, alleged in Paragraph 54 above, that Judge O'Brien and the Clerk's Office had been on notice since June 18, 2024 — nearly seven months before this hearing — that Mr. Caban was investigating Judge O'Brien and four other sitting judges for suspected bias and had threatened to publicize his findings, supplying the objective, temporally-proximate evidence of retaliatory animus that Nieves requires. That motive is still further supported by the facts alleged in Paragraphs 40, 44, and 55 above: the court conferred with Deputy McCue before ruling and before any attempted departure; resumed its routine docket immediately after the seizure without any step consistent with a genuine psychiatric emergency; and the mental-health framing of Mr. Caban by Arlington County officials predated the hearing by months.

**107.** Bailiff McCue's, ACPD Doe's, Female Court Officer Doe's, and the John Doe Courthouse Officers' conduct in physically blocking Mr. Caban's exit with weapons gripped and executing an arrest for which no charge could be articulated exceeded any quasi-judicial immunity that might otherwise attach to the execution of a facially valid judicial order, because an order to arrest a person for filing a protected motion, without any underlying offense — and, as alleged in Paragraph 40 above, without any competency colloquy, medical consultation, or evidentiary predicate of any kind — is not facially valid within the meaning of that doctrine.

**108.** As a direct and proximate result, Mr. Caban was deprived of his liberty for approximately ninety-one additional days and suffered the dignitary and psychological harm of a public courtroom seizure predicated on a stigmatizing and false declaration of mental incompetency, supporting compensatory damages, under this Count, of not less than $500,000 for that dignitary and reputational injury. This seizure additionally generated the permanent, judicially created record of a court-ordered mental-health evaluation and involuntary psychiatric commitment that Mr. Caban must disclose in every future national-security adjudication under Standard Form 86, Section 21 — a continuing professional and national-security career injury supporting compensatory damages of not less than $1,000,000, concretely evidenced by the May 25, 2025 Triple Canopy protective-services offer that did not mature into employment because Mr. Caban remained on the probation imposed following these proceedings. The loss-of-liberty damages for the ninety-one-day confinement itself are pleaded under Counts II and X and are not sought in duplication here. Mr. Caban was thereafter subjected to the forced-medication and involuntary-commitment injuries described in Counts IX and X.

## COUNT IX

### Fourteenth Amendment — Due Process (Sell Violation)

### *Forced Antipsychotic Medication Without Judicial Findings* — 42 U.S.C. § 1983

### Against Dr. Beth Gouse, NP Akame Ekwe, Dr. Eugene Foris Simopoulos, and the Arlington County Sheriff

**109.** Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

**110.** Sell v. United States, 539 U.S. 166 (2003), permits the involuntary administration of antipsychotic medication to render a defendant competent to stand trial only where the treatment is medically appropriate, is substantially unlikely to have side effects undermining the fairness of trial, and, after consideration of less intrusive alternatives, is necessary to further an important governmental interest — findings that must be made by a court, not by a clinician's *ultimatum*.

**111.** Defendant Dr. Gouse's recommendation, based upon a single conversation rather than the structured forensic evaluation required by Va. Code § *19.2-169.1*(A), and Defendant NP Akamei's and Arlington County DHS staff's communication of an ultimatum — take antipsychotic medication or be sent to Western State Hospital — substituted clinical and administrative coercion for the judicial findings Sell requires. Because no court order conforming to Va. Code § *19.2-169.1* preceded or authorized Dr. Gouse's recommendation, that recommendation was not made in the performance of a judicially delegated function, and no absolute or quasi-judicial immunity attaches to it; the same is true, a fortiori, of the ultimatum communicated by *NP Akamei* and *DHS staff*, which no court directed.

**112.** Defendant Dr. Simopoulos thereafter prescribed and maintained Mr. Caban on Olanzapine 10mg three times daily despite the complete absence of any psychotic disorder diagnosis, in his Western State Hospital record or in any other medical record of any provider, as set forth at ¶¶ 112A–112B below, and in a clinical record that documents only ADHD, PTSD, hypertension, asthma, and a right ankle injury.

**112A.** Prior to February 18, 2025, Mr. Caban had never been prescribed an antipsychotic medication by any provider. The complete prescription record of the United States Department of Veterans Affairs — the federal agency responsible for his care as a service-connected veteran — contains three medications in total, and all three are sertraline, an antidepressant: a 50 mg prescription issued November 15, 2024 by prescriber Timothy Coffman at the North Las Vegas VA Medical Center; a 100 mg prescription issued November 27, 2024 by prescriber Jessica Pacannuayan at the Washington VA Medical Center; and a further 100 mg prescription whose recorded expiration date is February 18, 2025 — the very day of his admission to Western State Hospital. No antipsychotic medication of any kind appears anywhere in his Department of Veterans Affairs record. The independent primary-care record maintained by AllCare Family Medicine and Urgent Care in Lorton, Virginia is to the same effect: olanzapine first appears in that practice's medication list with a start date of May 7, 2025, the date of his first post-discharge visit, reconciled into the chart from the Western State Hospital discharge list after the fact.

**112B.** No provider in any health system — the Department of Veterans Affairs, Mr. Caban's primary-care practice, or Western State Hospital itself — has ever entered a formal diagnosis of a psychotic-spectrum disorder on his problem list. The problem list maintained by his primary-care practice records hyperlipidemia, hyperkalemia, obesity, attention deficit

hyperactivity disorder of the predominantly inattentive type, essential hypertension, erythrocytosis, elevated serum creatinine, mixed anxiety and depressive disorder, difficulty concentrating, and snoring. It records no schizophrenia, no schizoaffective disorder, no bipolar disorder, no delusional disorder, and no psychosis of any description. His treating Department of Veterans Affairs psychiatrist recorded that Mr. Caban denied auditory hallucinations, visual hallucinations, and delusions; recorded "Mania/hypomania: None"; recorded that he had never been psychiatrically hospitalized and had never attempted suicide; and, upon direct examination, recorded that "there was no clinical evidence of psychosis, mania, or anxiety observed during the interview." Western State Hospital's admitting psychiatrist raised, but over more than a month of continuous inpatient observation was unable to confirm, a differential impression of delusional disorder; that institution's own discharge note records affirmatively that Mr. Caban "demonstrated no symptoms consistent with a psychotic process" and that his discharge mental status examination showed "no evidence of delusional thinking or A/V hallucinations or paranoia at present."

**112C.** The specific belief that Western State Hospital and the Arlington County Department of Human Services treated as evidence of psychosis was Mr. Caban's account of his own counterintelligence background. Western State Hospital's records characterize his statements about his professional history as "grandiose," refer to his "purported military service," and record, as evidence of disorganized and paranoid presentation, his statement that he was thought to suffer from a delusional belief that he is a counterintelligence officer. That account was true and was verifiable from documents then in existence and, in part, in Arlington County's own possession. Mr. Caban's Military Occupational Specialty was 35L10 — Counterintelligence Agent — as recorded on his DD Form 214, which also reflects his

Combat Action Badge and Honorable Discharge. His National Geospatial-Intelligence Agency Counterintelligence Officer (Contractor) credential, Badge SIC-0192, was active on the date of his arrest, was physically examined by the arresting officers as pleaded in Paragraph 36, and recites on its face that its bearer "is authorized to conduct counterintelligence related activities." No defendant is alleged to have contacted the Department of Veterans Affairs, the National Geospatial-Intelligence Agency, or any records custodian to verify these assertions before recording them as symptoms. A clinical judgment that a documented biographical fact is a delusion, reached without any attempt at verification, is not entitled to the deference that professional judgment ordinarily receives, and it materially inflated the apparent severity of Mr. Caban's presentation at the precise moment that presentation was being used to justify his continued confinement and medication.

**112D.** The only psychiatric diagnoses Mr. Caban carried at the time of his admission were attention deficit hyperactivity disorder and a mood or anxiety condition treated with a single antidepressant. Olanzapine is approved by the Food and Drug Administration for the treatment of schizophrenia and bipolar I disorder. It bears no approved indication for attention deficit hyperactivity disorder, and none for post-traumatic stress disorder. Defendant Simopoulos accordingly prescribed a medication indicated for neither of the conditions his patient actually had.

**112E.** The prescribed regimen of 10 mg administered three times daily amounts to 30 mg per day. The approved labeling for olanzapine establishes an adult dosing range of 5 to 20 mg per day, with a target dose of 10 mg per day, and states that the safety and effectiveness of doses exceeding 20 mg per day have not been established in clinical trials. The dose administered to Mr. Caban was fifty percent above that ceiling. This allegation is pleaded not as an

independent wrong but as one element of the absence of any lawful justification for the regimen as a whole.

**112F.** Western State Hospital's discharge note states that the treatment team "maintained his historical diagnosis of PTSD" but "judged that he also met criteria for a hypomanic episode," and that olanzapine was introduced and then incorporated into his scheduled regimen on that basis. No diagnosis of Bipolar I or Bipolar II disorder was entered on any problem list, by any provider, at any point before, during, or after his commitment. A hypomanic episode standing alone, unaccompanied by a diagnosis of bipolar disorder, is not a condition for which olanzapine carries approval from the Food and Drug Administration; neither is post-traumatic stress disorder, the diagnosis Western State Hospital itself describes as having been maintained as primary throughout the admission. The rationale the institution recorded therefore does not supply an approved indication for the medication it administered.

**112G.** Upon his admission Western State Hospital discontinued the methylphenidate that had been prescribed to treat his attention deficit hyperactivity disorder — the condition he actually had — and substituted an antipsychotic indicated for conditions he did not have. That Mr. Caban was taking methylphenidate immediately before his detention is documented independently of his own account and independently of Western State Hospital: a diagnostic sleep study conducted on April 3, 2024 at the Comprehensive Sleep Care Center and interpreted by James Tomkinson, M.D. records, in its clinical history, that "the patient is on the following medications: Methylphenidate, Sertraline HCl." Methylphenidate appears nowhere on the Western State Hospital discharge medication list.

**113.** None of the individual Defendants named in this Count has identified any judicial order containing the individualized findings Sell requires. Their conduct violated Mr. Caban's clearly established due process right to refuse unwanted antipsychotic medication absent such findings. Washington v. Harper, 494 U.S. 210 (1990); Riggins v. Nevada, 504 U.S. 127 (1992). On August 15, 2026, in response to a request under the Virginia Freedom of Information Act, the Privacy and FOIA Officer of the Virginia Department of Behavioral Health and Developmental Services — the state agency that operates Western State Hospital — confirmed in writing, following a search of Mr. Caban's complete electronic health record, that "there are no judicial orders or findings that relate to the Sell v. United States, 539 U.S. 166 (2003) in reference to Olanzapine medication." The absence of the authorization this Count alleges is therefore established by the Commonwealth's own written admission.

**113A.** Mr. Caban was admitted to Western State Hospital under Code 47, an Order for Treatment of Incompetent Defendant, for the express purpose of restoring his competency to stand trial — the precise circumstance to which *Sell* applies. On the day of his admission, and before any episode of agitation had occurred, Western State Hospital entered a standing physician order authorizing intramuscular injection of olanzapine, 10 mg, expressly qualified "For refusal of PO" — that is, an injection triggered by his refusal of the oral form. On the following day its clinical staff recorded his mental status as "Judgment: good based on adherence with medications," in an institution where the clinical assessment of judgment informs the competency determination that governed the date of his release, and its nursing staff recorded on the first day of the admission that the "patient will remain compliant with treatment plan in preparedness for discharge." Its social work record states that his "discharge will be dependent on the outcome of" the competency evaluation. Medication was

administered under direct observation of ingestion, including visual inspection of the mouth, at both Western State Hospital and the Arlington County Detention Facility.

**113B.** Consent obtained under those conditions is not the free and voluntary consent of a decision-maker. A patient held by court order for competency restoration, whose refusal of an oral antipsychotic has been met in advance by a standing order for its injection, whose adherence to that medication is scored as a measure of his clinical judgment, and whose release turns upon that clinical assessment, is subject to precisely the coercion the individualized judicial findings required by *Sell* exist to prevent. That no refusal of olanzapine appears in the medication administration record is not evidence that the medication was voluntary; every refusal Mr. Caban did record — of melatonin, of hydroxyzine, and of a multivitamin — concerned a medication bearing no relationship whatever to the restoration of his competency, while the antipsychotic that did bear upon it was never once refused.

**113C.** Western State Hospital first administered olanzapine to Mr. Caban on February 21, 2025. It did not determine that he possessed the capacity to consent to treatment until March 3, 2025 — ten days later. Its psychiatry note of that date records the determination as a change in his consent status and states the reason for the change: "Capacity status previously undetermined due to possibility of entrenched delusions." For the first ten days of the regimen, therefore, Western State Hospital possessed neither a judicial authorization for the medication nor its own determination that Mr. Caban was capable of consenting to it. The assertion in its discharge note that he "retains capacity to consent to his own treatment" and "was his own decision-maker during the current admission" is contradicted by its own contemporaneous record.

**113D.** At no point did any court, and no administrative body, make a finding that Mr. Caban was dangerous to himself or to others such as would authorize the involuntary administration of antipsychotic medication upon that separate basis. Western State Hospital's own records state the purpose of the admission repeatedly and without qualification: Mr. Caban was "here for restoration of competency to stand trial," admitted "under legal status of Code 47, treatment of incompetent defendant," with treatment goals framed in terms of his "ability to be restored to trial competency." Where the purpose of antipsychotic medication is the restoration of a defendant's competency to stand trial, *Sell* supplies the governing standard and requires judicial findings upon each of its four factors, established by the government by clear and convincing evidence, before the medication is administered. Neither that standard nor any alternative dangerousness standard was satisfied here, because no finding of any kind was ever made.

**114.** As a direct and proximate result, Mr. Caban suffered the invasion of a fundamental liberty interest through the administration of Olanzapine without the individualized judicial findings *Sell* requires, supporting compensatory damages, under this Count, of not less than $1,000,000, together with the separate injury of being prescribed an antipsychotic medication above its labeled maximum dose while a flagged hepatic abnormality and a flagged lipid abnormality went unmonitored for the balance of his commitment, as set forth at ¶¶ 114A–114B below, supporting additional compensatory damages of not less than $250,000 — a total of not less than $1,250,000 under this Count.

**114A.** On February 19, 2025, the day after his admission and before the olanzapine regimen was established, Western State Hospital's own laboratory recorded an alanine aminotransferase level of 94 U/L, flagged by that laboratory as above its reference range, together with a triglyceride level of 193 mg/dL, likewise flagged as high. The institution was aware of the hepatic abnormality and recorded it, its primary care discharge note stating that "ALT was mildly elevated with negative screening for Hep B and C" — that is, that the elevation was known, was investigated, and remained unexplained. With that abnormality documented and unresolved, Defendant Simopoulos prescribed and maintained olanzapine, a hepatically metabolized antipsychotic associated with transaminase elevation and with metabolic disturbance, at fifty percent above its labeled maximum daily dose, for the remaining five weeks of the commitment.

**114B.** Over those five weeks Western State Hospital obtained no repeat hepatic panel, no repeat lipid panel, and no repeat hemoglobin A1c. Three laboratory events appear in the entire record of the admission — February 19, 2025, March 10, 2025, and March 26, 2025 — and the March 10, 2025 event consisted of vital signs alone. The lipid values and hemoglobin A1c printed upon the discharge summary of March 26, 2025 are not discharge values at all; they carry the February 19, 2025 timestamp of the admission draw. During the same period Mr. Caban's recorded weight rose from 89.4 kilograms on February 18, 2025 to 93.1 kilograms on March 12, 2025, an increase of approximately eight pounds in twenty-two days, with his body mass index rising from 27 to 28. Rapid weight gain and metabolic disturbance are the best-documented adverse effects of olanzapine, and the hospital took no measurement during the commitment by which the contribution of the medication to that gain could be assessed.

The failure to monitor a patient placed on an above-label dose of a metabolically active antipsychotic, in the face of two abnormal values the institution had itself flagged and recorded, constituted deliberate indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97 (1976).

**114C.** The regimen did not end with the commitment. Western State Hospital's discharge medication list of March 27, 2025 continued olanzapine at 10 mg three times daily, and Mr. Caban was returned to the custody of the Arlington County Detention Facility upon that regimen. The dose exceeding the labeled maximum, and the hepatic and metabolic risks that went unmonitored throughout the commitment, therefore continued beyond it.

**115.** To the extent any serious medical or psychiatric need of Mr. Caban was met with deliberate indifference during his custody at the Arlington County Detention Facility, such conduct is attributable to the Arlington County Sheriff and the John Doe Detention and Medical Personnel responsible for his care. *Estelle v. Gamble*, 429 U.S. 97 (1976). This allegation is pleaded together with, and in the alternative to, the Sell-based theory set forth above and does not seek damages in duplication of it.

## COUNT X

### Fourteenth Amendment — Due Process (Jackson v. Indiana)

### Disproportionate Commitment Duration for a Misdemeanor — 42 U.S.C. § 1983

### Against the Arlington County Sheriff and Arlington County

**116.** Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

**117.** Jackson v. Indiana, 406 U.S. 715 (1972), holds that a defendant committed solely to determine and restore competency cannot be held longer than reasonably necessary to determine whether competency can be restored, and that the nature and duration of commitment must bear a reasonable relation to its purpose.

**118.** Mr. Caban was confined for approximately ninety-one days — thirty-three days at the Arlington County Detention Facility, whose custody and release the Arlington County Sheriff controlled; thirty-seven days at Western State Hospital, to which he was committed on the strength of the January 16, 2025 courtroom declaration; and a further twenty-one days returned to the custody of the Arlington County Detention Facility following his discharge from Western State Hospital on March 27, 2025, until his release on April 17, 2025 — on a misdemeanor Trespass charge that was ultimately Nolle Prosequi'd, triggered by a courtroom declaration of incompetency made without any evidentiary hearing and never supported by the outpatient-first evaluation that Va. Code § 19.2-169.1(B) requires as the default. As to the Arlington County Sheriff: the duration and conditions of the detention-facility confinement bore no reasonable relation to the misdemeanor charge. As to Arlington County: its Department of Human Services personnel advanced the medication-or-hospital ultimatum that prolonged and escalated the confinement. The duration and restrictiveness of this confinement bore no reasonable relation to the misdemeanor charge that nominally justified it, and Mr. Caban was, in the end, found competent throughout. Arlington County's liability under this Count is not premised on respondeat superior: it rests on the customs, training failures, and ratification pleaded in Count IV, together with the practice of Arlington County Department of Human Services personnel — applied to Mr. Caban and pleaded as the County's de facto policy — of presenting medication-or-hospitalization ultimatums in lieu of

the outpatient-first evaluation that Va. Code § 19.2-169.1(B) prescribes as the statutory default. *Monell*, 436 U.S. at 690–94.

**119.** As a direct and proximate result, Mr. Caban endured approximately thirty-seven days of involuntary psychiatric commitment as an adjudicated incompetent — notwithstanding his ultimate finding of competency — a stigmatic and liberty-depriving injury disproportionate to any legitimate governmental purpose, supporting compensatory damages, under this Count, of not less than $500,000. To the extent this ninety-one-day confinement overlaps the loss-of-liberty period pleaded under Counts II and VIII, the damages under this Count are pleaded in the alternative and not in duplication.

**COUNT XI**

***Virginia State Law — False Imprisonment and Battery***

**January 16, 2025 Courthouse Seizure — Pendent State Claim (28 U.S.C. § 1367)**

**Against Bailiff McCue, ACPD Doe, Female Court Officer Doe, and John Doe Courthouse Officers 1–10**

**120.** Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

**121.** Under Virginia law, false imprisonment is the direct restraint of personal liberty without sufficient legal justification, and battery is the unwanted touching of another. The physical blocking of Mr. Caban's exit, the use of weapons gripped in a show of force, and his physical seizure and arrest without any articulable charge constitute false imprisonment and battery under Virginia common law.

**122.** Virginia sovereign immunity does not protect government employees who commit intentional torts, regardless of whether they acted within the scope of their employment. James v. Jane, 221 Va. 43 (1980); Messina v. Burden, 228 Va. 301 (1984). The conduct alleged in this Count is intentional, not negligent, and is accordingly not shielded by sovereign immunity.

**123.** As a direct and proximate result, Mr. Caban sustained the dignitary, liberty, and psychological harms described in Count VIII. This Count states an independent Virginia common-law basis for those harms against the same Defendants and is pleaded in the alternative; no separate or additional compensatory sum is sought beyond the damages recoverable under Count VIII.

**COUNT XII**

**Virginia State Law — Assault and Battery**

**December 23, 2024 Use of Force — Pendent State Claim (28 U.S.C. § 1367)**

**Against Defendant Laprise and John Doe Officer(s) 1–5**

**124.** Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

**125.** Under Virginia common law, battery is an unwanted touching of another that is neither consented to, excused, nor justified, and assault is an act intended to place another in reasonable apprehension of imminent bodily harm. The tackle of Mr. Caban and the deployment of OC spray against his person on December 23, 2024 — force initiated before any resistance and preceded by a remark evidencing racial animus — constituted harmful and offensive touching's without legal justification. Under Virginia law, a law enforcement officer's privilege to use force in effecting an arrest extends only to reasonable force; force

that is excessive is unprivileged and actionable as assault and battery notwithstanding the arrest itself.

**126.** Virginia sovereign immunity does not protect government employees who commit intentional torts, regardless of whether they acted within the scope of their employment. James v. Jane, 221 Va. 43 (1980); Messina v. Burden, 228 Va. 301 (1984). The conduct alleged in this Count is intentional, not negligent, and is accordingly not shielded by sovereign immunity. This Count is pleaded independently of, and in the alternative to, Count I, and does not depend upon the resolution of any federal question.

**127.** As a direct and proximate result of the assault and battery, Mr. Caban sustained the physical injuries, PTSD exacerbation, and dignitary harms described in Count I, supporting the same compensatory damages of not less than $5,250,000, pleaded in the alternative and not in duplication of Count I, and — given the willful, wanton, and racially malicious character of the conduct — punitive damages under Virginia law.

**COUNT XIII**

**Virginia Code § 8.01-42.1 — Racially Motivated Violence, Intimidation, and Harassment**

**Pendent State Statutory Claim (28 U.S.C. § 1367)**

**Against Defendant Laprise**

**128.** Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

**129.** Virginia Code § 8.01-42.1(A) creates a civil action for a person subjected to (i) intimidation or harassment, or (ii) violence directed against his person, where such acts are motivated by racial animosity. Officer Laprise's verbalization of a remark evidencing racial animus — its

precise language subject to confirmation through discovery of currently withheld body-worn camera audio and Computer-Aided Dispatch records — immediately before deploying OC spray against Mr. Caban, a Black man, followed by a physical tackle, constitutes violence directed against Mr. Caban's person motivated by racial animosity within the plain meaning of the statute. Once its precise wording is confirmed in discovery, the contemporaneous remark is probative evidence of the racial motivation the statute requires.

**130.** Virginia Code § 8.01-42.1(B) entitles a prevailing plaintiff to compensatory damages, punitive damages, and an award of the cost of the litigation, including reasonable attorneys' fees. This statutory claim arises under Virginia law, is independent of 42 U.S.C. § 1983, is not subject to the federal qualified-immunity defense, and — as an action predicated on intentional conduct — is not shielded by Virginia sovereign immunity. James v. Jane, 221 Va. 43 (1980); Messina v. Burden, 228 Va. 301 (1984).

**131.** As a direct and proximate result of the racially motivated violence, Mr. Caban sustained the racial dignitary and emotional injury set forth in Count III, supporting compensatory damages of not less than $1,000,000, pleaded in the alternative and not in duplication of Count III. Because this claim arises under Va. Code § 8.01-42.1(B), it independently entitles Mr. Caban to punitive damages and to the costs of this litigation, including reasonable attorneys' fees, against Defendant Laprise.

## STATEMENT OF DAMAGES

**132.** The compensatory damages Plaintiff seeks are set forth within each Count above and are summarized here to demonstrate that they are not duplicative. Each category of compensatory harm is assigned to a single Count as its primary basis; where a Count is pleaded in the alternative (for example, the Virginia common-law Counts that mirror the federal Counts arising from the same acts), the damages are not additive. Each category is recoverable against Arlington County as compensatory damages under *Monell* where the County's policy was a moving force (Count IV), against the individual Defendants in their individual capacities, and, as to Sheriff-affiliated Defendants, subject to the Eleventh Amendment caveat set forth above. Punitive damages are sought solely against the individual Defendants. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981).

**133.** The primary compensatory damages, by originating Count, are: Count I (excessive force) — $750,000 (physical injury and permanent disability), $2,000,000 (PTSD exacerbation), and $2,500,000 (future life-care), totaling $5,250,000; Count II (false arrest) — $817,500 (loss of liberty and unlawful detention); Count III (equal protection) — $1,000,000 (racial dignitary harm); Count VIII (retaliatory courthouse seizure) — $500,000 (dignitary and reputational harm) and $1,000,000 (professional and national-security career harm); Count IX (forced medication) — $1,000,000 (invasion of the liberty interest in refusing antipsychotic medication) and $250,000 (prescription above the labeled maximum dose and failure to monitor flagged hepatic and metabolic abnormalities); and Count X (disproportionate commitment) — $500,000 (involuntary psychiatric commitment). These primary compensatory categories total not less than $10,317,500. Counts V, VI, VII, XI, XII, and XIII plead the same injuries in the alternative or on a derivative basis and do not add to this total;

Count IV establishes Arlington County's municipal liability for the compensatory damages of Counts I, II, III, and VII.

**134.** Lost earning capacity (pleaded in the alternative). Prior to these events Plaintiff earned annual compensation of $189,188.37 plus benefits valued at approximately $32,681. The Department of Veterans Affairs has determined that Plaintiff's combined service-connected evaluation is 100 percent and that he is "totally and permanently disabled due solely to [his] service-connected disabilities," effective October 9, 2025. Plaintiff does not allege that the Department of Veterans Affairs has made any determination of individual unemployability, and pleads no such finding. To the extent the violations alleged herein materially contributed to that escalation in Plaintiff's service-connected condition and to his resulting inability to return to employment of comparable compensation and responsibility, the present value of his lost earning capacity exceeds $3,500,000. This category is pleaded in the alternative to, and not in duplication of, the wage-loss damages sought in *Caban v. Verizon Communications, Inc.*, No. 1:25-cv-01361-RDA-LRV (E.D. Va.), and the per-Count categories above, to avoid double recovery.

**135.** Adverse inference from suppression of evidence. Arlington County's withholding of all 409 responsive records in 2025 and of a further 13 records in 2026, and any failure to preserve body-camera and OC-spray records after service of the litigation-hold demand, support an adverse-inference instruction that the withheld or destroyed evidence would have been favorable to Plaintiff and independently support sanctions. Fed. R. Civ. P. 37(e).

**136.** Punitive damages. The individual Defendants acted with reckless and callous indifference to, and in willful violation of, Plaintiff's clearly established rights, satisfying the standard for punitive damages under *Smith v. Wade*, 461 U.S. 30 (1983). Given the racially motivated and physically violent character of the misconduct, an award at the outer boundary of the single-digit ratio guideposts of *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), and *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003), is warranted. Plaintiff seeks punitive damages against the individual Defendants in an amount not less than $20,000,000.

**137.** The primary compensatory damages itemized above total not less than $10,317,500, exclusive of the alternative lost-earning-capacity claim, together with punitive damages of not less than $20,000,000, yielding total damages in excess of Thirty Million Dollars ($30,000,000), plus attorneys' fees and costs under 42 U.S.C. § 1988 and Va. Code § 8.01-42.1(B), and pre- and post-judgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Cleo Manuel Caban respectfully requests that this Court enter judgment in his favor and against all Defendants, and award the following relief:

**138.** Compensatory damages in an amount not less than Ten Million Three Hundred Seventeen Thousand Five Hundred Dollars ($10,317,500.00), and as further proven at trial, as itemized within Counts I, II, III, VIII, IX, and X above and reconciled in the Statement of Damages, including past and future medical and mental-health expenses; economic losses including the continuing professional-standing and national-security career harm described in Count VIII; the loss of liberty from pretrial detention and the January 16, 2025 courthouse seizure;

physical pain and permanent physical injury; the administration of an antipsychotic medication above its labeled maximum dose and the failure to monitor the hepatic and metabolic abnormalities Western State Hospital had itself flagged and recorded; and past and future emotional distress, psychological harm, and PTSD exacerbation; or, at minimum, an award of nominal damages, which redress every completed constitutional violation without proof of consequential harm, *Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021);

**139.** Punitive damages against the individual Defendants in an amount not less than Twenty Million Dollars ($20,000,000.00), the reckless and callous indifference of the individual Defendants to Mr. Caban's clearly established rights satisfying the standard of Smith v. Wade, 461 U.S. 30 (1983), and the willful, racially motivated character of the violations justifying an award at the outer boundary of the single-digit ratio guideposts of BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996), and State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003);

**140.** A declaration pursuant to 28 U.S.C. § 2201 that Defendants violated Plaintiff's rights under the First, Fourth, Sixth, and Fourteenth Amendments to the United States Constitution;

**141.** An order requiring Arlington County to produce all 409 FOIA records withheld under Request No. P003262-051825 and all 13 records withheld under Request No. C008645-081226, with individualized review of each record, and to disclose the body camera footage depicting the December 23, 2024 incident, together with all courthouse security records identifying Bailiff McCue and the John Doe Courthouse Officers for January 16, 2025;

**142.** Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and, as to Count XIII, the cost of litigation including reasonable attorneys' fees pursuant to Va. Code § 8.01-42.1(B);

**143.** Pre-judgment and post-judgment interest at the maximum rate permitted by law;

**144.** A permanent injunction requiring Arlington County and the Arlington County Sheriff to adopt and implement use-of-force, courtroom-detention, FOIA-disclosure, and disability-accommodation policies and training sufficient to prevent recurrence of the violations alleged herein;

**145.** An order, pursuant to Fed. R. Civ. P. 26(a)(1)(A)(iv), directing each Defendant to produce at the earliest practicable date all insurance agreements and indemnification policies or agreements under which any person or entity may be liable to satisfy all or part of a judgment;

**146.** Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

[signature]

CLEO MANUEL CABAN
Plaintiff, Pro Se
1770 Rockledge Terrace
Woodbridge, Virginia 22192
Telephone: (202) 330-2466
Email: cleocaban@gmail.com
Date: 27th of August 2026

## CERTIFICATE OF SERVICE

I, Cleo Manuel Caban, hereby certify that on the date indicated, I caused the foregoing to be filed with the Clerk of the United States District Court for the Eastern District of Virginia, Alexandria Division. No Defendant has been served or has appeared in this action; accordingly, no further service is required at this time.

Cleo M. Colon ______________________ Date: 27 August 2026

Cleo Manuel Caban, Pro Se

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
Alexandria **DIVISION**

Cleo M. Caban
**Plaintiff(s),**

v.

Civil Action Number: 1:26-cv-2810

Joshua R. Laprise et al.
**Defendant(s),**

## LOCAL RULE 83.1 (N) CERTIFICATION

**I declare under penalty of perjury that:**

**No attorney has prepared or assisted in the preparation of** Caban v. Laprise et al. (42 U.S.C. § 1983); Civil Cover Sheet (JS 44); IFP Motion; *Motion for Leave to Take Expedited Discovery* Motion for Appointment of Counsel Certification of A.I. Usage Six completed summonses (AO 440).
**(Title of Document)**

Cleo M. Caban
Name of *Pro Se* Party (Print or Type)

Cleo M. Caban
Signature of *Pro Se* Party

Executed on: 26 August 2026 (Date)

M: 202.330.2466
E: CleoCaban@gmail.com

**OR**

**The following attorney(s) prepared or assisted me in preparation of** ______________________.
**(Title of Document)**

______________________
(Name of Attorney)

______________________
(Address of Attorney)

______________________
(Telephone Number of Attorney)
Prepared, or assisted in the preparation of, this document.

______________________
(Name of *Pro Se* Party (Print or Type)

______________________
Signature of *Pro Se* Party

Executed on: ______________________(Date)